[L. A. No. 26905. In Bank. July 2, 1963.]

JACOB ZEITLIN et al., Plaintiffs and Appellants, v. ROGER ARNEBERGH, as City Attorney, etc., Defendant and Respondent.

Nathan L. Schoichet, A. L. Wirin and Fred Okrand for Plaintiffs and Appellants.

Brock & Fleishman, Stanley Fleishman, Bayard F. Berman and Sol Rosenthal as Amici Curiae on behalf of Plaintiffs and Appellants.

Roger Arnebergh, City Attorney (Los Angeles), in pro. per., Philip E. Grey, Assistant City Attorney, William E. Doran and Edward P. George, Deputy City Attorneys, for Defendant and Respondent.

John J. Clancy as Amici Curiae on behalf of Defendant and Respondent.

TOBRINER, J.—In this case "Tropic of Cancer" by Henry Miller makes another one of its many court appearances. Its record to date has been a varied one; in some places the book is "obscene" and in others it is not; presently its legal status is largely tied into the geography of its sale or publication.[1] In any event, our first task must be to deter-

---

[1] The book has been held not obscene in *Attorney General* v. *Book Named "Tropic of Cancer"* (1962) 344 Mass. 11 [184 N.E.2d 328]; *McCauley* v. *Tropic of Cancer* (1963) 20 Wis.2d 134 [121 N.W.2d 545]; *People* v. *Fritch* (1963) 38 Misc.2d 333 [236 N.Y.S.2d 706]; and *Haiman* v. *Morris* (1962, No. 61 S 19718, Superior Ct of Cook County, Ill.). The book has been held obscene in *Besig* v. *United States* (9th Cir. 1953) 208 F.2d 142; *State* v. *Huntington* (1962, No. 24657, Superior Ct. Hartford County, Conn.); and *Commonwealth* v. *Robin* (1962, No. 3177, Ct. of Common Pleas, County of Philadelphia, Pa.).

In California there has been one conviction of a bookseller for the sale of the book (*People* v. *Smith* (1962, Municipal Ct., Los Angeles Judicial Dist.; affd., No. CRA 5113 Appellate Dept., Superior Ct. of Los Angeles County; cert. granted 373 U.S. 901 [83 S.Ct. 1288, 10 L.Ed.2d 198])) and two acquittals of booksellers (*People* v. *Pershina* (No. 16644, Municipal Ct., Central Judicial Dist., Marin County) and

mine whether the instant form of action, that of declaratory relief requested by a bookseller and would-be reader, properly presents the issue of the book's proscription under Penal Code section 311. We hold this form of relief appropriate. Our second question turns upon whether the issue of the application of the statute to this book, within constitutional limitations, rests ultimately with the court, as a matter of law, or with the jury as a question of fact. We think it a legal issue. Finally, since we believe the Penal Code section constitutionally may exorcise only hard-core pornography, and since the statute does no more, we hold the book does not fall within its prohibition because "Tropic of Cancer" is not hard-core pornography.

The plaintiff bookseller and plaintiff prospective purchaser brought the action against the City Attorney of Los Angeles to secure a declaratory judgment that the book was not "matter" defined as "obscene" by Penal Code section 311,[2] and that its sale would not violate Penal Code section 311.2.[3] Plaintiffs appended to the complaint a copy of the book and excerpts from several book reviews by critics which proclaim its literary merit. Defendant answered, denying many of the allegations of the complaint, but admitting that he contends that the sale of the book violates Penal Code section

*People* v. *McGilvery* (No. M-11466, San Diego Municipal Ct.)). In *Yudkin* v. *State* (1962) 229 Md. 223 [182 A.2d 798], the court reversed the defendant's conviction for the sale of the book because the trial court refused to admit evidence of contemporary community standards, but held that it could not hold as a matter of law that the book was not obscene. In *Bunis* v. *Conway* (1962) 17 App.Div.2d 207 [234 N.Y.S.2d 435], the court held that a declaratory judgment action by a bookseller would lie to determine whether the book was obscene, but the court did not pass on the merits of the book. The court in *State* v. *Goodhue* (1962, No. 2223, Superior Ct., Grafton County, N.H.) held that the book was obscene, but that the defendant's conduct came within the "advancement of literature" exception of the statute. The Attorney General of the United States reportedly announced that the book is protected and that post office and customs officials cannot interfere with its distribution. (New York Times, June 14, 1961.) In England the government reportedly announced that it would not interfere with the sale of the book. (New York Times, Western ed., April 12, 1963, p. 11, col. 4.)

[2]Penal Code section 311 provides in part:
"(a) 'Obscene' means that to the average person, applying contemporary standards, the predominant appeal of the matter, taken as a whole, is to prurient interest, i.e., a shameful or morbid interest in nudity, sex, or excretion, which goes substantially beyond customary limits of candor in description or representation of such matters and is matter which is utterly without redeeming social importance. . . ."

[3]Penal Code section 311.2 provides in part:
"Every person who knowingly . . . distributes, or offers to distribute . . . any obscene matter is guilty of a misdemeanor."

311.2. In a separate declaration the defendant stated that he intends to prosecute all persons arrested in the City of Los Angeles for the sale of "Tropic of Cancer." Defendant also entered a general demurrer to the complaint. The trial court sustained the demurrer without leave to amend and entered a judgment dismissing the action. In a memorandum entry in the minutes the judge stated that he had upheld the demurrer both because, having read the book, he determined it to be obscene and because plaintiffs have failed to state a cause of action.

In assessing the propriety of the trial court's order sustaining the demurrer without leave to amend, we face the preliminary question of whether an action for declaratory judgment instituted by a bookseller and a prospective purchaser will lie to determine the alleged obscenity of a particular book under the code provisions. While potential defendants have frequently sought declaratory relief to avoid prosecution under statutes which they have sought to prove unconstitutional (see e.g., *Wollam* v. *City of Palm Springs* (1963) *ante,* p. 276 [29 Cal.Rptr. 1, 379 P.2d 481]; *Katzev* v. *County of Los Angeles* (1959) 52 Cal.2d 360 [341 P.2d 310]), plaintiffs here do not challenge the constitutionality of the involved statute unless it sanctions the prosecution of "Tropic of Cancer." In that event, however, plaintiffs do contend that the statute both constitutes an unconstitutional restraint on freedom of speech and also attempts a proscription which is unconstitutionally vague under the First and Fourteenth Amendments to the United States Constitution and article I, sections 9 and 13, of the California Constitution.[4]

The precedents, as well as other compelling reasons, support a declaratory relief action in the present case. The gravamen of the plaintiffs' complaint is that although the statute cannot properly be interpreted to apply to "Tropic of Cancer," defendant nevertheless contends that the book is "obscene matter" within the terms of the statute and intends to prosecute those who sell it. Thus the complaint alleges a genuine controversy involving the construction of particular legislation as to which it seeks a judicial determination. Such a complaint, according to the prior cases, sufficiently states a claim for declaratory relief. (*Walker* v. *County of Los An-*

---

[4]Our interpretation of the statute, which we set forth *infra,* renders unnecessary the consideration of these contentions as to unconstitutionality.

*geles* (1961) 55 Cal.2d 626, 637 [12 Cal.Rptr. 671, 361 P.2d 247]; *Hoyt* v. *Board of Civil Service Comrs.* (1942) 21 Cal. 2d 399 [132 P.2d 804].)

We have stated that considerations beyond the precedents support the adjudication of the alleged obscenity of a particular book in a declaratory relief action.[5] As we shall explain in more detail, the vendor of the questioned book faces the possibility of prosecution and his very fear of it may work a de facto censorship of the publication. The would-be reader, in the absence of declaratory relief, may be deprived of his constitutional rights. Finally, diverse results of the enforcement of the obscenity statute may result in a crazy-quilt pattern of a publication's suppression.

Plaintiff Zeitlin alleges that he is engaged in business as a bookseller and that he wishes to sell ''Tropic of Cancer'' in his bookstore, but that he is prevented from offering the book because he fears that if he does so defendant will institute criminal proceedings against him. To deny Zeitlin, a legitimate businessman, an opportunity for declaratory relief is to force him to choose between undesirable alternatives. If he continues to sell the book he incurs the risk of criminal prosecution and faces the fine, jail sentence, or both, which may be imposed if he is found guilty,[6] or he sustains the accompanying stigma which attaches even though he may ultimately be found innocent.[7] As an alternative he may assume the role of self-appointed censor, prodded by the city attorney, and discontinue the sale of any book which could possibly offend the latter. The city attorney should not thus become an indirect censor of public reading matter; his abuse of such power could constitute an unlawful restraint upon the dissemination of literature not otherwise censorable. (*Bantam Books* v. *Sullivan* (1963) 372 U.S. 58 [83 S.Ct. 631, 9 L.Ed.2d 584].)

[5]These considerations are also discussed in *Bunis* v. *Conway* (1962) 17 App.Div.2d 207 [234 N.Y.S.2d 435]; Borchard, Declaratory Judgments (2d ed. 1941) p. 1035.

[6]Penal Code section 311.9 provides in part:
''(a) Every person who violates section 311.2 is punishable by fine of not more than one thousand dollars ($1,000) plus five dollars ($5) for each additional unit of material coming within the provisions of this chapter, which is involved in the offense, not to exceed ten thousand dollars ($10,000), or by imprisonment in the county jail for not more than six months plus one day for each additional unit of material coming within the provisions of this chapter, and which is involved in the offense, such basic maximum and additional days not to exceed 360 days in the county jail, or by both such fine and imprisonment. . . .''

[7]*People* v. *Elliot* (1960) 54 Cal.2d 498, 504 [6 Cal.Rptr. 753, 354 P.2d 225]; *Greenberg* v. *Superior Court* (1942) 19 Cal.2d 319 [121 P.2d 713].

Plaintiff Ferguson alleges that he desires to purchase a copy of "Tropic of Cancer" but is unable to do so because the bookseller, thus fearful of prosecution, refuses to sell the publication. Unless Ferguson is able to find a bookseller willing to face the possibility of criminal prosecution and the attendant described risks, he will be deprived of his basic constitutional right to read. Thus declaratory relief may offer the only method for vindication of this constitutional right.

A final reason for the invocation of declaratory relief lies in its decisiveness. Sporadic and diverse criminal prosecutions must necessarily produce discriminatory results. A finding of guilt of one purveyor of obscene publications will not necessarily discourage others; indeed such vendors characteristically operate undercover[8] and are inclined to recidivism.[9] If, on the other hand, a verdict expresses a determination that the material is not obscene the city attorney is still free to prosecute another bookseller for selling the same publication. If a criminal verdict, whether of guilt or of innocence, operates primarily within a particular county to ban the book in the case of guilt, or to encourage its sale in the case of innocence, an opposite result might readily obtain in another county. Such an approach must inevitably engender a hodgepodge pattern of suppression and sale.

Nor does our statutory procedure insure a method of uniform adjudication by means of criminal prosecution. Until a third offense, the sale of obscene matter to adults constitutes a misdemeanor. (Pen. Code, § 311.9.) Thus the defendant ordinarily will be tried in the municipal court; if found guilty he may appeal, as a matter of right, only to the appellate department of the superior court.[10] To resolve the issue at this level raises not only the possibility of contradictory rulings on the obscenity of a particular work, but also the probability of conflicting interpretations of the obviously perplexing Penal Code section 311.

Since plaintiffs set forth facts showing the existence

---

[8] See D. H. Lawrence, Pornography and Obscenity, reprinted in The Portable Lawrence (1947) pp. 646, 653.

[9] See e.g., *Roth* v. *United States* (1956) 77 S.Ct. 17 [1 L.Ed.2d 34], n. 2 (Roth's application for bail.) ". . . petitioner 'has been convicted in or pleaded guilty in six criminal proceedings involving the dissemination of obscene literature. . . .' "

[10] Pen. Code., §§ 1466-1471; Cal. Rules of Court, rules 61-69 (formerly Rules on Transfer of Municipal and Justice Court Appeals, rules 61-69).

of an actual controversy and have requested that these rights be adjudged by the court in a matter in which the court is competent to grant declaratory relief, they have stated a legally sufficient complaint. Upon presentation of such complaint, a plaintiff is entitled to a declaration of his rights, whether the declaration be favorable or adverse; thus in the instant case the trial court's order sustaining the demurrer and its dismissal of the action cannot be upheld upon the ground that plaintiffs pursued the wrong kind of action. (*Salsbery* v. *Ritter* (1957) 48 Cal.2d 1 [306 P.2d 897]; *Columbia Pictures Corp.* v. *De Toth* (1945) 26 Cal.2d 753 [161 P.2d 217, 162 A.L.R. 747]; *Maguire* v. *Hibernia S. & L. Soc.* (1944) 23 Cal.2d 719 [146 P.2d 673, 151 A.L.R. 1062].)

As we have stated, ''Our decision that controversies are shown to exist, however, does not resolve them, and we must therefore pass upon the questions of law that must be decided to reach a final determination of the case. (Code Civ. Proc., § 53.)'' (*Salsbery* v. *Ritter, supra,* at p. 7; *Columbia Pictures Corp.* v. *De Toth, supra.*) While in *Maguire* the unresolved issues of the special demurrer in the trial court justified the termination of appellate review, we do not face such a situation here. Termination at that stage in the instant case would merely provoke further appellate recourse since the record discloses that the trial court dismissed the case on the merits and the legal issues are clearly presented by the pleadings. Thus as in *Salsbery* v. *Ritter, supra,* and *Columbia Pictures Corp.* v. *De Toth, supra,* we shall proceed, as we must, to a consideration of the determinative questions of law raised in plaintiffs' complaint.

Turning to the issue of statutory and constitutional construction which the complaint raises, we believe that this issue must be resolved by this court; it cannot properly be reposed in a jury for final disposition as a question of fact.[11] The crux of our case is whether the definition of obscene matter in Penal Code section 311 sanctions prosecution of sellers of ''Tropic of Cancer'' and whether the constitutional guarantees of freedom of speech and freedom of the press (U.S. Const., 1st and 14th Amends.; Cal. Const., art. I, § 9)

---

[11]By so holding, we do not wish to be interpreted as sanctioning the impairment of rights traditionally accorded criminal defendants: the right to introduce evidence which tends to disprove the accusation (*In re Harris* (1961) 56 Cal.2d 879 [16 Cal.Rptr. 889, 366 P.2d 305]) and the right to have the jury determine all relevant issues bearing upon guilt, including the question of whether the material is obscene.

permit such prosecution. As we shall point out in more detail, the courts have long recognized that such questions of statutory and constitutional construction and application call for court decisions; they raise issues, not of the ascertainment of historical fact, but the definition of statutory proscription and constitutional protection; the court itself must determine the law of the case for the sake of consistent interpretation of the statute and uniform determination of whether particular matter is obscene.

As Justice Harlan eloquently states in *Roth* v. *United States* (1957) 354 U.S. 476 [77 S.Ct. 1304, 1 L.Ed.2d 1498]: "Every communication has an individuality and 'value' of its own. The suppression of a particular writing or other tangible form of expression is, therefore, an *individual* matter, and in the nature of things every such suppression raises an individual constitutional problem, in which a reviewing court must determine for *itself* whether the attacked expression is suppressable within constitutional standards. . . .

"I do not think that reviewing courts can escape this responsibility by saying that the trier of facts, be it a jury or a judge, has labeled the questioned matter as 'obscene,' for, if 'obscenity' is to be suppressed, the question whether a particular work is of that character involves not really an issue of fact but a question of constitutional *judgment* of the most sensitive and delicate kind. . . ." (354 U.S. at pp. 497-498.)

■ Justice Harlan's conception of the nature of judicial review to be accorded a finding of obscenity expresses a doctrine firmly imbedded in our constitutional law: that the reviewing court must make an *independent examination* of the whole record in cases involving the constitutional issue of free speech. (*Edwards* v. *South Carolina* (1963) 372 U.S. 229, —— [83 S.Ct. 680, 9 L.Ed.2d 697]; *Niemotko* v. *Maryland* (1951) 340 U.S. 268 [71 S.Ct. 325, 328, 95 L.Ed. 267, 280]; *Feiner* v. *New York* (1951) 340 U.S. 315 [71 S.Ct. 303, 328, 95 L.Ed. 267, 295]; *Pennekamp* v. *Florida* (1946) 328 U.S. 331 [66 S.Ct. 1029, 90 L.Ed. 1295]; *Fiske* v. *Kansas* (1927) 274 U.S. 380 [47 S.Ct. 655, 71 L.Ed. 1108]; *Attorney General* v. *Book Named "Tropic of Cancer"* (1962) 344 Mass. 11 [184 N.E.2d 328]; *People* v. *Richmond County News* (1961) 9 N.Y.2d 578, 580-581 [216 N.Y.S.2d 369, 175 N.E.2d 681] [opinion of Fuld, J.]; see *Supreme Court Review of State Findings of Fact in Fourteenth Amendment Cases*, 14 Stan.

L.Rev. 328 (1962).)[12] As Judge Fuld stated in the *Richmond County News* case, ". . . if an appellate court were to rely upon and be bound by the opinion of the trier of facts as to the obscenity of a publication it would be abdicating its role as an arbiter of constitutional issues." (9 N.Y.2d at p. 581.)

 The determination of what is obscene in the statutory or constitutional sense is not a question of fact (i.e., a question of what happened) but rather is a question of fact mixed with a determination of law: a "constitutional fact." Historical facts, as such, are rarely at issue in that part of an obscenity prosecution which focuses upon the character of the material involved.[13] In the instant case the parties agree that they both refer to the same book, "Tropic of Cancer," written by the same author, Henry Miller. The dispute, rather, pivots upon whether the volume transgresses the standards imposed by the Legislature and by the Constitutions; our judicial system entrusts this decision ultimately to the courts.

Thus the draftsmen of the Model Penal Code of the American Law Institute have recently recognized that, in the interests of uniformity, the question of obscenity must be left to the independent judgment of courts. In the Tentative Draft of the Model Penal Code the draftsmen originally inserted a provision which allowed both the trial and appellate courts to make an independent determination of the obscenity of the material, permitting the courts in so doing to consider, as evidence, written submissions by behavioral scientists.[14] The reporter's notes to the Tentative Draft state that the institute disapproved this provision "by a close vote." (The tentative draft had been published only one month before the decision in *Roth*.) Section 251.4(4) of the Proposed Official Draft of the Model Penal Code (1962) provides in part,

---

[12]The same principle applies in the coerced confession cases: *People* v. *Trout* (1960) 54 Cal.2d 576 [6 Cal.Rptr. 759, 354 P.2d 231, 80 A.L.R. 2d 1418]; *People* v. *Berve* (1958) 51 Cal.2d 286 [332 P.2d 97]; *People* v. *Jones* (1944) 24 Cal.2d 601 [150 P.2d 801]; *Blackburn* v. *Alabama* (1960) 361 U.S. 199 [80 S.Ct. 274, 4 L.Ed.2d 242]; *Ashcraft* v. *Tennessee* (1944) 322 U.S. 143 [64 S.Ct. 921, 88 L.Ed. 1192].

[13]The determination of other elements necessary to make out a violation of Penal Code section 311.2 may be dependent upon historical facts. For example, on the issue of *scienter* it may be relevant whether the defendant actually read the allegedly obscene matter prior to the sale of the material.

[14]American Law Institute, Model Penal Code, Tentative Draft No. 6, § 207.10. Section 251.4 is the corresponding section in the Proposed Official Draft.

"The Court shall dismiss a prosecution for obscenity if it is satisfied that the material is not obscene."

The reporter's notes to the Proposed Official Draft contain the following comment on this provision: ". . . The present version is much simplified and omits provisions, to which most objections were voiced, for judges to consult behavioral scientists and for written submissions by these consultants. What we preserve in the present draft is *the independent judgment of the court on the question of obscenity* without impairing defendant's right to a jury trial. This is desirable in order to promote statewide uniformity of standards in this critical area. The action of the Supreme Court of the United States in a series of obscenity cases after the Roth decision indicates the large extent to which the question of obscenity is one of law in any case, because of the application of the First Amendment." (Italics added; p. 241.)

Finally, we do not believe that the definition of "obscene" material as that which "to the *average person* . . . predominant appeal . . . is to prurient interest . . ." (italics added) indicates that the ultimate determination of that question is always for the jury. These words fix a *standard* which is to be applied to the material; they do not designate the body which is to apply the standard. The statutory language does not inherently predicate a question for the jury; it merely frames a definition. As we hereinafter point out, the Legislature wrote the words "average man" into the statute because a lesser standard would offend constitutional guarantees; the phrase does not serve to mark the respective spheres of the court and jury.

We turn, then, to our task of determining whether "Tropic of Cancer" constitutes obscene matter within the meaning of the statute and the constitutional limitations. To understand the statute we must first examine the constitutional setting in which the California Legislature in 1961 completely recast Penal Code sections 311 and 312 (Stats. 1961, ch. 2147). The Legislature patterned its definition of 'obscenity upon that set forth in the American Law Institute's Model Penal Code (§ 207.10), portions of which had been approved as constitutionally permissible standards by the United States Supreme Court in *Roth* v. *United States* (1957), *supra*, 354 U.S. 476. This decision and others of the United States Supreme Court, we think, impliedly drew a line of constitutional protection around all material except that which

has been described as hard-core pornography. In this analysis, which we shall develop, we follow the interpretations of the distinguished New York Court of Appeals and Supreme Judicial Court of Massachusetts.

*Roth* and the companion case of *Alberts* v. *California*[15] involved appeals by defendants from convictions for violation of the federal and California obscenity statutes respectively. While these were the first United States Supreme Court cases squarely to confront the question of "whether obscenity is utterance within the area of protected speech and press" (p. 481), the issues were so framed that the majority of the court adjudicated the validity of each statute on its face without passing on the merits of the attacked materials. As the majority opinion stated, "No issue is presented in either case concerning the obscenity of the material involved." (P. 481, fn. 8.) The court therefore had no occasion to rule upon the three categories of material presented to it by the brief of the Solicitor General.[16] Affirming the convictions of Roth and Alberts, the Supreme Court held the statute did not violate the requirements of the United States Constitution[17] as to freedom of expression and definitude.

Mr. Justice Brennan, writing the majority opinion, held that "obscenity is not within the area of constitutionally protected speech or press" (p. 485) because, in the words that were later incorporated in the Califoria statute, obscenity is "utterly without redeeming social importance." (P. 484.) He points out that "sex and obscenity are not synonymous . . . [and the] portrayal of sex, e.g., in art, literature and scientific works . . . [is entitled to] the constitutional protection of freedom of speech and press" (p. 487) provided that it does not become the designated kind of obscenity. The majority opinion sought to separate the protected from the unprotected material by the use of the term "obscenity." It approved the statutory standards under which the defendants were convicted, as well as the Model Penal Code formulation, because these tests did not contain the vices present in the archaic test used in *Regina* v. *Hicklin* (1868) L.R. 3 Q.B.

---

[15]The court disposed of both cases in one opinion.

[16]Lockhart & McClure, *Censorship of Obscenity, the Developing Constitutional Standards* (1960) 45 Minn. L.Rev. 5, 26.

[17]In *Roth* the court also considered whether the power to punish obscenity was reserved to the states by the Ninth and Tenth Amendments; in *Alberts* it considered whether the federal statute regulating the mailing of obscene matter preempted regulation by the states. The court rejected both contentions.

360, a test which many,[18] but not all,[19] American courts had discarded.

The court expressly exposed the two basic flaws in *Hicklin*. One such vice was that *Hicklin* judged obscenity by the effect of isolated passages; the Model Penal Code expresses its rejection of this test by requiring that the material be "considered as a whole" and that "its predominant appeal" be "to the prurient interest." In order to give color, texture and meaning to the whole of his expression, an artist may sometimes feel that he must depict matters which, standing alone, would unanimously be condemned as beyond the limits of propriety. (Cf. *Grove Press, Inc.* v. *Christenberry* (2d Cir. 1960) 276 F.2d 433, 438-439; *United States* v. *One Book Called "Ulysses"* (S.D.N.Y. 1933) 5 F.Supp. 182, 184.) Thus in *Roth* the court gave constitutional recognition to the employment of the device of artistic shock often present in the myriad of art forms which our society demands for its intellectual and cultural growth. The insistence upon judgment of the material "as a whole" and by its "predominant appeal" also serves to alleviate, but not necessarily entirely abolish, the dilemma which has been noted by several courts which have observed the coarseness of portions of recognized classics of art and literature although no rational person would condemn such works as obscene.[20]

The other major vice of *Hicklin* which the Supreme Court rejected was its application of the test of isolated passages upon those metaphysical personalities "whose minds are open to such immoral influences and into whose hands a publication may fall"; i.e., the most susceptible persons. The constitutional requirement for a standard phrased in terms of the reaction of an average adult to the material rather than that of the most susceptible person, had been, of course, forecast by the court's unanimous rejection of the Michigan obscenity statute in *Butler* v. *Michigan* (1957) 352 U.S. 380 [77 S.Ct. 524, 1 L.Ed.2d 412].

The four justices who did not join in the majority opinion

---

[18]See, e.g., *American Civil Liberties Union* v. *City of Chicago* (1954) 3 Ill.2d 334 [121 N.E.2d 585]; *United States* v. *One Book Entitled "Ulysses"* (2d Cir. 1934) 72 F.2d 705.

[19]See, e.g., *Besig* v. *United States* (9th Cir. 1953) 208 F.2d 142.

[20]*United States* v. *Roth* (2d Cir. 1956) 237 F.2d 796, 819 (concurring opinion of Frank, J.), affd. sub. nom. *Roth* v. *United States* (1957) 354 U.S. 476 [77 S.Ct. 1304. 1 L.Ed.2d 1498]; *United States* v. *One Book Entitled "Ulysses"* (2d Cir. 1934) 72 F.2d 705; *Commonwealth* v. *Gordon* (1949) 66 Pa. D. & C. 101.

recognized that material relating to sex found protection in the constitutional guarantee of freedom of expression. Indeed, Justices Douglas and Black argued that the Constitution forbade all obscenity consorship except in cases in which it was demonstrated that "the particular publication has an impact on action that the government can control." (P. 511.) In a short opinion, Chief Justice Warren isolated the central issue as the "conduct of the defendant" rather than the "obscenity of a book or picture." (P. 495.) Apparently the chief justice extends constitutional protection to obscene materials if the defendant's own conduct is not personally reprehensible.

The most revealing opinion is that of Justice Harlan, who concurred in *Alberts* but dissented in *Roth*. We have pointed out that Justice Harlan held that a reviewing court should determine for itself, by scrutiny of the attacked material, whether it "is suppressable within constitutional standards." (P. 497.) Justice Harlan's opinion, which applies this test to the material itself, constitutes the sole such approach of any of the opinions. Accordingly, in *Roth* Justice Harlan found the material did not constitute hard-core pornography and voted to reverse the conviction. He stated: ". . . The point is that this statute, as here construed, defines obscenity so widely that it encompasses matters which might very well be protected speech. I do not think that the federal statute can be constitutionally construed to reach other than what the Government has termed as 'hard-core' pornography. . . ." (P. 507.) In *Alberts* he concluded that the suppression of the material would not so "interfere with the communication of 'ideas' in any proper sense of that term" (p. 503) as to offend due process, and therefore affirmed the conviction.

The hard-core pornography test so delineated by Justice Harlan finds confirmation in three succeeding decisions of the United States Supreme Court.[21] The cases arose from decisions of the Court of Appeals which upheld the obscenity of the material there involved: a film dealing with the seduction of a 16-year-old boy by an older woman and other "illicit sexual intimacies and acts" (*Times Film Corp.* v. *Chicago*

---

[21]A fourth such case, *Mounce* v. *United States* (1957) 355 U.S. 180 [78 S.Ct. 267, 2 L.Ed.2d 187], probably is not within this group because the United States Supreme Court reversed the cause for consideration in light of *Roth* after the Solicitor General conceded that the court below had applied an erroneous standard.

(1957) 355 U.S. 35 [78 S.Ct. 115, 2 L.Ed.2d 72]) ; a magazine for homosexuals (*One, Inc.* v. *Olesen* (1958) 355 U.S. 371 [78 S.Ct. 364, 2 L.Ed.2d 352]) ; and a nudist magazine (*Sunshine Book Co.* v. *Summerfield* (1958) 355 U.S. 372 [78 S.Ct. 365, 2 L.Ed.2d 352]).[22] In *per curiam* decisions citing

[22]The Court of Appeals in *Times Film Corp.* v. *City of Chicago* (7th Cir. 1957) 244 F.2d 432, 436, described the material as: "⌊T⌋he thread of the story is supercharged . . . by a series of illicit sexual intimacies and acts . . . [A] flying start is made when a 16 year old boy is shown completely nude on a bathing beach in the presence of a group of younger girls [as a result of a boating accident]. On that plane the narrative proceeds to reveal the seduction of this boy by a physically attractive woman old enough to be his mother. Under the influence of this experience and an arrangement to repeat it, the boy thereupon engages in sexual relations with a girl of his own age. The erotic thread of the story is carried, without deviation toward any wholesome idea, through scene after scene. The narrative is graphically pictured with nothing omitted except those sexual consummations which are plainly suggested but meaningfully omitted and thus, by the very fact of omission, emphasized."

The Court of Appeals in *One, Inc.* v. *Olesen* (9th Cir. 1957) 241 F.2d 772, 777, described the material as: "The article 'Sappho Remembered' is the story of a lesbian's influence on a young girl only twenty years of age but 'actually nearer sixteen in many essential ways of maturity,' in her struggle to choose between a life with the lesbian, or a normal married life with her childhood sweetheart. The lesbian's affair with her room-mate while in college, resulting in the lesbian's expulsion from college, is recounted to bring in the jealousy angle. The climax is reached when the young girl gives up her chance for a normal married life to live with the lesbian. This article is nothing more than cheap pornography calculated to promote lesbianism. It falls far short of dealing with homosexuality from the scientific, historical and critical point of view.

"The poem 'Lord Samuel and Lord Montagu' is about the alleged homosexual activities of Lord Montagu and other British Peers and contains a warning to all males to avoid the public toilets while Lord Samuel is 'sniffing' round the drains' of Picadilly (London). The poem pertains to sexual matters of such a vulgar and indecent nature that it tends to arouse a feeling of disgust and revulsion. It is dirty, vulgar and offensive to the moral senses. . . ."

The District Court, in *Sunshine Book Co.* v. *Summerfield* (D.D.C. 1955) 128 F.Supp. 564, 571-572, of one of the photographs found obscene, said:

"On page 29 [of Sunshine & Health for February, 1955] there is a most unusual picture. Here are two women who appear to be in their late twenties or early thirties. The woman to the left appears to be approximately 5 foot 7. She must weigh in the neighborhood of 250 pounds. She is exceedingly obese.

". . . . . . . . . . .

"She has large, elephantine breasts that hang from her shoulder to her waist. They are exceedingly large. The thighs are very obese. She is standing in snow, wearing galoshes. But the part which is offensive, obscene, filthy and indecent is the pubic area shown.

". . . The hair extends outwardly virtually to the hip bone. It looks to the Court like a retouched picture because the hair line instead of being straight is actually scalloped or in a half-moon shape, which makes the woman grotesque, vile, filthy, the representation is dirty, and the Court will hold that the picture is obscene in the sense that it is indecent, it is filthy, and it is obscene as a matter of fact. . . ."

only *Roth* or *Alberts,* the Supreme Court reversed the judgments.

Clearly the most plausible meaning of these summary reversals, in view of the citation of only *Roth* or *Alberts,*[23] must be that the materials there involved could not be held obscene. As Professor Kalven observes: ''These three decisions, coupled with the citation of *Roth,* point unmistakably in one direction: the Court is feeling the pressure generated by the two-level theory to restrict obscenity to the worthless and hence to something akin to hard-core pornography. Thus the three decisions appear to add important gloss to the *Roth* definition. And the prophecy that *Roth* would serve to narrow the range of obscenity regulation appears fulfilled.'' (Kalven, *The Metaphysics of the Law of Obscenity,* 1960 Sup. Ct. Rev. 1, 43.)[24]

*Kingsley Intl. Pictures Corp.* v. *Regents* (1959) 360 U.S. 684 [79 S.Ct. 1362, 3 L.Ed.2d 1512], although interpreted by the majority of the court as a case which involved an attempt to suppress matter dealing with sex for reasons other than the ''obscenity'' of the material, also serves to illustrate the great breadth of protection ac-

---

[23]Each of these cases involved procedural problems which would have justified the court in refusing to consider the issue of obscenity. The court's citation of *Roth* or *Alberts,* however, indicates that the reversals were on the obscenity issue. These cases are ably analyzed in Lockhart & McClure, *supra,* fn. 16 at pp. 32-39; Kalven, *The Metaphysics of the Law of Obscenity,* 1960 Supreme Court Review, 1, 42-45; Comment, *Per Curiam Decisions of the Supreme Court:* 1957 Term, 26 U. Chi. L. Rev. 279, 309-313 (1959). Professor Kalven quotes at length from a brief Thurman Arnold submitted to the Vermont Supreme Court which espouses a challenging position. Kalven summarizes Arnold's position as: ''The main point is advice to the Vermont court on how to handle the issue before it sensibly and diplomatically. Mr. Arnold purports to get his rule of judicial prudence from the United States Supreme Court. The rule is simple: the court should hold items before it not obscene unless they amount to hard-core pornography, and should, after rendering a decision, shut up. In Mr. Arnold's view, any fool can quickly recognize hard-core pornography, but it is a fatal trap for judicial decorum and judicial sanity to attempt thereafter to write an opinion explaining why.'' (P. 43.)

[24]To Professor Kalven, the two-level approach to problems of the First Amendment results from the United States Supreme Court's analysis which requires a showing of a clear and present danger as the ground for the suppression of most utterances but which allows the suppression of obscenity (*Roth* v. *United States, supra*), ''fighting words'' (*Chaplinsky* v. *New Hampshire* (1942) 315 U.S. 568 [62 S.Ct. 766, 86 L.Ed. 1031], and group libel (*Beauharnais* v. *Illinois* (1952) 343 U.S. 250 [72 S.Ct. 725, 96 L.Ed. 919], without such a showing because the utterances there involved are ''utterly without redeeming social importance'' (*Roth*) or are ''no essential part of any exposition of ideas'' (*Chaplinsky* and *Beauharnais*).

corded materials dealing with sex. There the New York Court of Appeals indicated that although the motion picture involved was not obscene, it might nonetheless be censored because it pictured adultery as proper behavior. The Supreme Court reversed, holding that this interfered with the freedom to advocate, which necessarily includes the freedom to advocate unpopular, even hateful, ideas. The breadth of the constitutional protection is also illustrated by the several cases involving various procedures used to suppress alleged obscenity. (*Kingsley Books, Inc.* v. *Brown* (1957) 354 U.S. 436 [77 S.Ct. 1325, 1 L.Ed.2d 1469]; *Smith* v. *California* (1959) 361 U.S. 147 [80 S.Ct. 215, 4 L.Ed.2d 205]; *Marcus* v. *Search Warrant* (1961) 367 U.S. 717 [81 S.Ct. 1708, 6 L.Ed.2d 1127]; *Bantam Books* v. *Sullivan* (1963) 372 U.S. 58 [83 S.Ct. 631, 9 L.Ed.2d 584].)

As we have stated, the highest courts of New York and Massachusetts, in interpreting the Supreme Court decisions, have recognized that boundary lines for the forbidden pale of obscenity must delimit only the area of hard-core pornography. Justice Fuld's opinion in *People* v. *Richmond County News* (1961) 9 N.Y.2d 578 [216 N.Y.S.2d 369, 175 N.E.2d 681], states: "Mindful of the constitutional necessity to open the door barring state intrusion into this area 'only the slight crack necessary' (*Roth* v. *United States, supra,* 354 U.S. 476, 488), and desirous of erecting a standard which embodies the most universal moral sensibilities and may be applied objectively, *we are of the opinion that the prohibitions of section 1141 of the Penal Law should apply only to what may properly be termed 'hard-core pornography.'*" (P. 586; italics added.)

Chief Judge Desmond's concurring opinion reiterates this analysis: "St. John-Stevas, one of the soundest and sanest of today's writers on the law of obscenity, says that: 'A pornographic book . . . is one deliberately designed to stimulate sex feelings and to act as an aphrodisiac' (Obscenity and the Law, p. 2; cf. *Roth* v. *United States,* 354 U.S. 476, 486, 487 [77 S.Ct. 1304, 1 L.Ed.2d 1498, 1507, 1508].) The identical thought is in Judge WOOLSEY's famed *Ulysses* opinion (*United States* v. *One Book Called "Ulysses,"* 5 F.Supp. 182, affd. 72 F.2d 705, 707) and in Justice BRENNAN's famous phrase: 'dominant theme of the material taken as a whole appeals to prurient interest' (*Roth* v. *United States, supra,* p. 489). *The inquiry for the court, therefore, is whether the*

*publication is so entirely obscene as to amount to 'hard-core pornography'. . . ."* (Pp. 588-589; italics added.)

Last year the Supreme Judicial Court of Massachusetts, in ruling upon the alleged obscenity of the book before us, applied the same test. That court in *Attorney General* v. *Book Named "Tropic of Cancer"* (1962) 344 Mass. 11 [184 N.E. 2d 328], explained that one of the five basic tenets of the *Roth* case was that "Hard core, commercial pornography, 'utterly without redeeming social importance' (see 354 U.S. 476, 484-485, 77 S.Ct. 1304, 1309 [1 L.Ed.2d 1498, 1506-1507]) is not within the protection of the First Amendment." (P. 331 [184 N.E.2d].) The court stated finally, "We conclude, therefore, as in effect the New York court did in the *Richmond County News* case, that, with respect to material designed for general circulation, only predominantly 'hard core' pornography, without redeeming social significance, is obscene in the constitutional sense." (Pp. 333-334 [184 N.E. 2d].)

In substance these courts, applying the rulings of the United States Supreme Court, hold that if material is commercial obscenity or saleable pornography it is obscenity in the sense that it is utterly without redeeming social importance; it is hard-core pornography; as such it lies outside the protective embrace of the First Amendment. If the material, however, has literary value, if it is a serious work of literature or art, then it possesses redeeming social importance and obtains the benefit of the constitutional guarantees.

Cognizant of these constitutional guarantees, the Legislature wrote a statute which, in substance, prohibited hard-core pornography;[25] the draftsmen recognized that a wider

---

[25]Of course identifying and delimiting "hard-core pornography" presents its own problems. In *Marcus* v. *Search Warrant* (1961) 367 U.S. 717, 730 [81 S.Ct. 1708, 6 L.Ed.2d 1127], the court stated: "[I]n *Roth* itself we expressly recognized the complexity of the test of obscenity fashioned in that case, and the vital necessity in its application of safeguards to prevent denial of 'the protection of freedom of speech and press for material which does not treat sex in a manner appealing to prurient interest.' " In *Bantam Books* v. *Sullivan* (1963) 372 U.S. 58, —— [83 S.Ct. 631, 9 L.Ed. 2d 584, 590], the court quoted this language from *Marcus* and went on to note that "constitutionally protected expression . . . is often separated from obscenity only by a dim and uncertain line." (See Note (1963) 76 Harv. L. Rev. 1498.) Undoubtedly we are in an area where the recourse to verbal descriptions is ultrahazardous. We note, however, two descriptions which may illuminate the area. Kaplan has written: "[Pornography] is not itself the *object* of an experience, esthetic or any' other, but rather a 'stimulus

proscription would trespass upon an area which is constitutionally protected. The legislative history itself shows a deliberate narrowing of the definition of "obscene" material; indeed, no words in the language could more totally express constriction of the concept of obscenity than those which the Legislature adopted. As we shall explain, the Legislature intentionally incorporated as part of the definition itself the important provision that obscene matter "is matter which is utterly without redeeming social importance," changing the function of these words from a description of a matter of defense to an element of the offense.

As originally introduced on February 28, 1961, Assembly Bill 1979 defined obscenity as that which "to the average person applying contemporary standards, the predominant appeal of the matter, taken as a whole, is to prurient interest." Subsequently on April 21, 1961, the Assembly further narrowed the definition by adding, "i.e., a shameful or morbid interest in nudity, sex, or excretion, which goes substantially beyond customary limits of candor in description or representation of such matters." After another set of amendments not here relevant, the Assembly added, on May 22, 1961, "or that it had the slightest redeeming social importance" to what is now section 311.8, which provides as a *defense* to a charge of obscenity that the matter is "in aid of scientific or educational purposes." The Assembly then passed the bill and sent it to the Senate.

The Senate substituted "other legitimate social purpose" for the Assembly language "or that it had the slightest redeeming social importance," and returned the bill to the Assembly.

On June 15, 1961, the Assembly, by a vote of 60-19, re-

---

*to* an experience not focused on it. It serves to elicit not the imaginative contemplation of an expressive substance, but rather the release in fantasy of a compelling impulse." (Kaplan, *Obscenity as an Esthetic Category* (1955) 20 Law & Contemp. Prob. 544, 548.)

The Kronhausens state: "*In pornography* (hard core obscenity) *the main purpose is to stimulate erotic response* in the reader. And that is all. *In erotic realism, truthful description of the basic realities of life, as the individual experiences it, is of the essence,* even if such portrayals . . . have a decidedly anti-erotic effect. But by the same token, if, while writing realistically on the subject of sex, the author succeeds in moving his reader, this too, is erotic realism, *and it is axiomatic that the reader should respond erotically to such writing,* just as the sensitive reader will respond, perhaps by actually crying, to a sad scene, or by laughing when laughter is evoked." (Kronhausen, *Pornography and the Law* (1959) p. 18.) (Italics in original.)

fused to concur in the Senate's amendments. An Assembly-Senate conference committee was appointed to break the deadlock. The next day the committee reported out the present version of section 311, with the words "and is matter which is utterly without redeeming social importance" added to the *definition* of obscenity in section 311 and providing in section 311.8 for a defense if the material be "in aid of legitimate scientific or educational purposes." (Assembly Journal, 1961 Regular Session, p. 5975.) With these changes the bill passed both houses and was signed by the Governor.

The importance of the insertion of this crucial language in the definition of obscenity rather than in the defense to it, is overshadowed only by the sweep of the words themselves. Webster's Third New International Dictionary defines "utterly" as: ". . . to an absolute or extreme degree; to the full extent; absolutely, altogether, entirely, fully, thoroughly, totally." (Compare similar restrictive judicial definitions of the term in *Delaware Mut. Safety Ins. Co.* v. *Gossler* (1877) 96 U.S. 645 [24 L.Ed. 863]; *Moody* v. *Moody* (1920) 118 Me. 454, 456 [108 A. 849]; *Pearsoll* v. *Chapin* (1862) 44 Pa. 9.) The meanings conveyed by the words "reasonably" or "preponderantly" are well known; had such been intended, the appropriate terms would have been used. By employing the term "utterly" the Legislature indicated its intention to give legal sanction to all material relating to sex except that which was *totally* devoid of social importance. The only material that falls into the latter category is hard-core pornography. This language, indeed, is the language of *Roth;* as we have shown, subsequent Supreme Court decisions, state courts and commentators have interpreted it to describe hard-core pornography.

The defendant construes the statute with the emphasis on "redeeming"; he contends that this indicates that the social importance of the material must outweigh its prurient appeal. This construction, however, reads the word "utterly," a term which permits no such balancing, out of the statute. By examining the origin of this phrase in *Roth* we are led to a construction which gives the whole phrase a consistent meaning: "redeeming" refers not to a balancing of the pruriency against the social importance of the material, but rather to the *presence* of matters of social importance in the content which will *recover* for the material its position as constitutionally protected utterance.

 If, then, the statutory proscription, consonant with constitutional limitations, prohibits only hard-core pornography, we must, as a final matter, determine if "Tropic of Cancer" constitutes such pornography. We, like four other courts that have ruled upon the book,[26] do not think so.

"Tropic of Cancer" is a semi-autobiographical novel written in the style of a surrealistic stream of consciousness which chronicles the author's experiences during his self-imposed exile in Paris in the early 1930's. Miller went to Paris to seek a rebirth within himself; he set himself the task of stripping away the restraints of the past so that he could emerge as a writer. He found that to do so he would have to achieve a cosmology, a view of the universe derived out of the interpretation of his experiences. Miller shares with the reader the process of prying that cosmology out of the folds of his existence. Hence any undertaking, be it a regular job or a fixed schedule of sponging food from his acquaintances, must be abandoned when it threatens to interfere with this grandiose search.

In examining the episodes which Miller relates, we note a frequently recurring pattern. Experiences not ordinarily pictured as related to sexual motivations are analyzed in flights of surrealistic fantasy in terms of sexual experiences. Ordinary sexual experiences, on the other hand, may evoke to Miller images usually unconnected with such experiences— for example, after setting the conventional stage in which he and a companion partake of the services of a prostitute, his fantasy describes the episode in terms of a machine with a broken cog. Thus, much of Miller's quest for a cosmology consists of his attempt to find the role of his sexual drives and frustrations. This aspect of the book recalls the caveat of Justice Brennan in *Roth*: ". . . Sex, a great and mysterious motive force in human life, has indisputably been a subject of absorbing interest to mankind through the ages; it is one of the vital problems of human interest and public concern." (354 U.S. at p. 487.) Miller's treatment of sex in "Tropic of Cancer" reflects his search for an understanding of this "mysterious motive force." But there is absent from the

---

[26]*Attorney General* v. *Book Named "Tropic of Cancer"* (1962) 344 Mass. 11 [184 N.E.2d 328]; *McCauley* v. *Tropic of Cancer* (1963) 20 Wis.2d 134 [121 N.W.2d 545]; *People* v. *Fritch* (1963) 38 Misc.2d 333 [236 N.Y.S.2d 706]; and *Haiman* v. *Morris* (1962, No. 61 S 19718, Superior Ct. of Cook County, Ill.).

book the sadism, masochism and treatment of sex in a morbid of shameful manner which frequently mark pornography.

In sum, the book in narrating Miller's stream of consciousness necessarily expresses the writer's thoughts in their most primitive aspect, often violent and repulsive, and constantly in four-letter words. The book embraces the emotional, the sexual, the intellectual, and every other kind of stimulus that intrudes upon the writer's consciousness. Thus the book is a kind of grotesque, unorthodox art-form. But indeed, such art-forms are not confined to literature; they appear and reappear in all phases of artistic expression.[27]

Such an art-form must be distinguished from that which is designed to excite or attract pruriency; it surely does not constitute hard-core pornography. Clearly the statute reposes no authority in the courts to act as censors of the manners or formulation of such artistic expression. The danger of state censorship has been too graphically demonstrated by the current decadence of Soviet art for us to assume that either *Roth* or the Legislature intended to import such debilitation.[28]

Indeed, a legal proscription cannot in any event constrict artistic creation. Man's drive for self-expression, which over the centuries has built his monuments, does not stay within set bounds; the creations which yesterday were the detested and the obscene become the classics of today. The quicksilver of creativity will not be solidified by legal pronouncement; it will necessarily flow into new and sometimes fright-

---

[27] "Modern art is, however, anti-impressionistic in yet another respect: it is a fundamentally 'ugly' art, foregoing the euphony, the fascinating forms, tones and colours of impressionism. It destroys pictorial values in painting, carefully and consistently executed images in poetry and melody and tonality in music. It implies an anxious escape from everything pleasant and agreeable, everything purely decorative and ingratiating. . . . [P]ost impressionist art is the first to stress the grotesqueness and mendacity of this culture. Hence the fight against all voluptuous and hedonistic feelings, hence the gloom, depression and torment in the works of Picasso, Kafka, and Joyce. . . ." (Hauser, The Social History of Art (1958) pp. 230-231.)

[28] As one student of Soviet literary controls observes: "Thus, there are fundamentally three standards for estimating the merit of a literary work: the truthfulness, or party-minded spirit, of the work's portrayal of reality, the work's pedagogic potentiality, and its intelligibility to the broad masses—all prerequisites for transforming literature into a serviceable social tool. In terms of Soviet doctrine, belles-lettres become an adjunct to politics and pedagogy, a sugar coating on the pill of knowledge and morality." (Swayze, Political Control of Literature in the USSR, 1946-1959 (1962) p. 17.)

ening fields. If, indeed, courts try to forbid new and exotic expression they will surely and fortunately fail. The new forms of expression, even though formally banned, will, as they always have, remain alive in man's consciousness. The court-made excommunication, if it is too wide or if it interferes with true creativity, will be rejected like incantations of forgotten witch-doctors. Courts must therefore move here with utmost caution; they tread in a field where a lack of restraint can only invite defeat and only impair man's most precious potentiality: his capacity for self-expression.

The judgment is reversed for further proceedings consistent with this opinion.

Gibson, C.J., Traynor, J., Schauer, J., McComb, J., Peters, J., and Peek, J., concurred.

Respondent's petition for a rehearing was denied July 31, 1963.