[Civ. No. 37956. Second Dist., Div. Two. Aug. 20, 1971.]

TOM LIPKIS, a Minor, etc., Plaintiff and Appellant, v.
R. W. CAVENEY, as Principal, etc., et al.,
Defendants and Respondents.

**COUNSEL**

Rowan Klein and Davis M. Rothman for Plaintiff and Appellant.

John D. Maharg, County Counsel, Ron Apperson and John A. Drummond, Deputy County Counsel, for Defendants and Respondents.

**OPINION**

**ROTH, P. J.**—Tom Lipkis (appellant) a student at Van Nuys High School, sought a writ of mandate compelling R. W. Caveney, principal at the high school, and the Board of Education of the Los Angeles Unified School District (respondents) to specifically permit four rallies to take place on that portion of the campus of the school known as the quad during lunch periods[1] on subjects selected by appellant and generally to "promulgate rules and procedures . . . which will allow on a regular basis peaceable speech and assembly by students at Van Nuys High School. . . ."[2]

The evidence showed that the school did provide facilities at lunch time for speech activities. These activities (Noon Forum, Discussion Club and Forum Club) were open to all students and, like the rallies sought by appellant, take place at lunch time on various days of the week. The trial court reflected these facts in its finding that the school does ". . . provide each student at Van Nuys High School an opportunity to discuss and criticize with propriety any issue the student desires to discuss."

---

[1] The trial court found that: "Over half of the students at Van Nuys High School eat their lunches and meet in the immediate vicinity of the Victory Stand on the quad during lunch time at Van Nuys High School."

[2] The petition for the writ of mandate, as did the alternative writ, sought a further order which would have permitted the rallies in question to take place without the "threat of suspension"; and a temporary restraining order, preliminary and permanent injunctions were sought as well.

Appellant does not contest the finding that "any issue" may be discussed by the students at these (authorized) school functions,[3] and concedes that the students' right to "First Amendment activities" must be "consonant with the school's interest in maintaining order and decorum through the establishment of rules reasonably necessary to further the school's education goals. (*Goldberg* v. *Regents of The University of California* (1967) 248 Cal.App.2d 867, 879 [57 Cal.Rptr. 463].)"

Thus, we do not have before us an instance of the complete prohibition of a protected activity (see e.g., *Mandel* v. *Municipal Court*, 276 Cal.App.2d 649, 662 [81 Cal.Rptr. 173]), nor are we faced with an attempt to censor specifically appellant's speech. (*Dunbar* v. *Governing Board*, 275 Cal. App.2d 14, 17 [79 Cal.Rptr. 662].) Finally, appellant does not contest the findings to the effect that on the immediately preceding March 9th appellant and others did cause disruption by attempting to hold an unauthorized assembly (*infra*).

■ Hemmed in by these significant concessions, appellant predicates his appeal on the claim that the prohibition of the rallies at the time and place in question was in and of itself a violation of the First Amendment. Thus, the sole issue at bench in terms of the very authorities cited by appellant is whether the prohibition of the rallies was a proper exercise of respondents' judgment that the rallies would and did "materially disrupt[ ] classwork or involve[ ] substantial disorder or invasion of the rights of others" and were therefore "not immunized by the constitutional guarantee of freedom of speech." (*Tinker* v. *Des Moines Community School Dist.*, 393 U.S. 503, 513 [21 L.Ed.2d 731, 741, 89 S.Ct. 733].) In considering this contention, we are mindful of the basic rule that a person does not have the unfettered right to "address a group at any public place and at any time." (*Cox* v. *Louisiana*, 379 U.S. 536, 554 [13 L.Ed.2d 471, 484, 85 S.Ct. 453].)

---

[3]No objections are raised *re* this finding in the appellate brief. The only objection, if it can be deemed such, to this determination of fact which is amply supported by respondent Caveney's declaration and which is uncontroverted by appellant is found in the objections to proposed findings of facts and conclusions of law, filed in the court below. The objections contain a summary allegation aimed at 11 of 14 findings of fact that the impairment of First Amendment rights is one of law, and not of fact, and that it is not the subject of "expert" testimony (whatever that may be in the case at bench). The declarations submitted (see fn. 4, *infra*) in this case do not purport to pass on legal question whether the "impairment" of appellant's right of free speech was permissible but they do provide the factual substructure of the trial court's findings of facts which are severely restricted to an enumeration of facts which, for the most part, even appellant admits are accurate. (*L.A. Teachers Union* v. *L.A. City Bd. of Ed.*, 71 Cal.2d 551, 556 [78 Cal.Rptr. 723, 455 P.2d 827].)

Respondent Caveney's testimony[4] reveals that appellant and several other students attempted to address students on March 9, 1970, by means of a battery-powered bull horn in the quad area where many students eat their lunch. Caveney had been forewarned of this rally which appears to have been sponsored by the "Radical Student Union," a group which had not followed school procedures in establishing itself as an official campus organization and was not recognized as such. Together with the vice-principal, Caveney informed the speakers, of whom appellant was one, that they were conducting an unauthorized gathering and that they were free to air their views and concerns in the other, recognized campus fora (Noon Forum, Discussion Group, Forum Club). According to appellant's own statement, "We argued with Mr. Caveney for a while . . . (!)" Their "arguments" having proved to be unavailing even if disruptive and obstreperous,[5] appellant and his cohorts were suspended from school only to be reinstated two days later.

The four rallies which were to commence on April 27 were requested by a group substantially similar in composition to that involved in an unauthorized meeting on March 9 which had resulted in disorder. Appellant was prominently active in the request for the four rallies to commence on April 27.

---

[4]Caveney's statement was received as a written declaration, as was appellant's. In addition to Caveney's, the written statements of three teachers were submitted which limited themselves to a brief recitation of the *facts* of disturbances caused by the "rallies" referred to by Caveney in his declaration.

[5]Mr. Caveney's description of the March 9 episode is as follows: "Accompanied by the vice-principal, I approached the stand. As we did so, the boy with the bull horn, Jon Vilette, a student at Van Nuys High School, ran from the stand taking the bull horn with him. A second boy, Jason Bass, a student at Van Nuys High School, commenced addressing the crowd in a loud voice. I gained his attention and informed him that the gathering was unauthorized and directed him to leave the stand. I informed him that failure to do so would result in his suspension. I repeated my instructions for him to cease and to leave the stage twice more, and on the third occasion informed him that he was suspended. Throughout this time, Tom Lipkis continued to interrupt me in a loud voice although I told him twice to get off the stand and stop participating in the unauthorized gathering. I told him if he persisted, I would have to suspend him. He kept arguing in a loud voice as to his rights and continued to address the crowd. My efforts throughout to disperse the unauthorized gathering were greeted by hoots, jeers, and cat calls from the crowd. Said Jon Vilette returned to the stage without the said bull horn; and he was suspended, as was a fourth boy, Gary Spire, before the stage was cleared. I announced to the crowd by means of my own bull horn that this was an unauthorized gathering. I informed the students that the regularly held Noon Forum in the auditorium was available to this group or any individual to air their complaints and concerns. The Noon Forum is available to any and all students. The said Noon Forum is held every Thursday noon in the auditorium and was instituted about a year ago. Tom Lipkis has been a regular visitor there wherein he has frequently expressed his criticism of the school, its rules and regulations."

Mr. Caveney had 20 years' experience in the school system. When he denied the request for the rallies in question, he recounted in his statement not only the immediately prior March 9th disturbance but in addition four specific instances, all occurring within three years prior to April 1970, where unsupervised rallies of high school students resulted in disgraceful episodes and caused disruption of the education process itself. Thus, the basis for Mr. Caveney's judgment was not only his specific and recent experience with appellant and his associates, but it was also based on solid experience with student gatherings of recent years closely akin to the intended rallies, the first of which was to commence on April 27. Mr. Caveney's judgment was therefore anything but based on "undifferentiated fear or apprehension of disturbance." (*Tinker* v. *Des Moines Community School Dist., supra,* 393 U.S. at p. 508 [21 L.Ed.2d at p. 738].) Our mandatorily independent examination of the record (*Zeitlin* v. *Arnebergh,* 59 Cal.2d 901, 909 [31 Cal.Rptr. 800, 383 P.2d 152, 10 A.L.R.3d 707]) reveals that prohibiting appellant from speaking *on the quad at noon* is the very prototype of a regulation which this or any court is bound to uphold. It does not prohibit the expression of any viewpoint; it does not prevent specifically appellant or any other designated student from voicing his, or anyone else's views; it rests on explicitly articulated facts and events which generally mandate the regulation; and, its aim is to protect the educational process and those partaking from it in our public schools from the whims and caprices, in Justice Black's trenchant words, ". . . of the[ ] loudest-mouthed, but maybe not the[ ] brightest, students." (*Tinker* v. *Des Moines Community School Dist., supra,* 393 U.S. 503 at p. 525 [21 L.Ed.2d at p. 749], Black, J., dissenting.)

The purpose of Van Nuys High School, as of any school, is to educate and not, as incisively observed by the trial judge, to provide appellant with a "captive audience for speechmaking," to wit: an audience composed of students who are having lunch at or about the quad.[6]

We emphasize that appellant had adequate and concededly *readily available* fora in which to exercise his right of free speech and to ventilate views he entertained relative to any problems of his school, his country or the world. Puerile, abrasive and contemptuous behavior cannot be whitewashed by constitutional incantations, which, if we understand them, give appellant the right to espouse in non-obscene language even the most unpopular views but which do not require Van Nuys High School or the school

---

[6]Students participating in the Noon Forum, the Discussion Group and the Forum Group, attend voluntarily and are permitted to bring their lunches. These activities are conducted in either the school auditorium or classroom—in any event, not at the quad which, as we have observed, is an open and centrally located area on school grounds.

system to guarantee to him on the school grounds a captive audience at the specific times he elects to address them.

Our Constitution extends no such guarantees to appellant or anyone else.

The judgment is affirmed.

Herndon, J., and Compton, J., concurred.