Donald H. Mead, J.
Defendants appeal from judgments of the Court of Special Sessions of the City of Syracuse wherein they were severally convicted of violations of subdivision 1 of section 1141 of the Penal Law following a joint trial by jury before Honorable Rocco P. Regitano, Acting Justice of said court. The information, by A. Jack Doolittle, a police officer of the City of Syracuse, charges that the defendants ‘1 did wilfully and unlawfully have in their possession with intent to sell, lend, distribute, give away, show, lewd, lascivious, filthy, sadistic, or disgusting book, to wit: 1 tropic op cancer ’ and did sell to one A. Jack Doolittle, Syracuse Police Officer for $.97 at the Economy Book and Stationery Store, 117 S. Salina St. in the City of Syracuse, N. Y., thereby violating See. 1141 Subd. 1 of the Penal Law of the State of New York.”
Defendants, upon this appeal, urge as grounds for reversal 22 alleged errors. However, the decision herein renders unnecessary detailed comment on any of them save one, namely, the denial of the defendants’ motion, made at the close of the People’s case and renewed at the close of the defendants’ proof, to dismiss the information on the grounds that said book, “ Tropic of Cancer ” is not obscene as a matter of law and is entitled to the protection of the Constitution of the State of New York and the First and Fourteenth Amendments of the United States Constitution. The main issue presented upon this appeal is whether the book is obscene since otherwise its publication and sale are protected by the constitutional guarantees of freedom of speech and press found in the First and Fourteenth Amendments of the United States Constitution. (Roth v. United States, 354 U. S. 476; Butler v. Michigan, 352 U. S. 380.)
*334 In Bunis v. Conway (17 AD 2d 207 [4th Dept., Nov. 13,1962]) the court, in reversing an order of the Special Term dismissing plaintiff’s complaint as insufficient, in an action for declaratory judgment seeking an adjudication that the book “ Tropic of Cancer ” is not “ obscene ” within the meaning of section 1141 of the Penal Law, stated (p. 209): “ The question of whether a particular book is obscene within the meaning of section 1141 of the Penal Law is a question of law, appropriate for decision in a declaratory judgment action, under the rule laid down in the authorities cited. No question of fact is involved, in the sense of a question as to what had factually occurred or what is factually proposed to be done. The content of the book is fixed and immutable. There may be different views as to whether the book comes within the condemnation of section 1141 of the Penal Law but this presents a question of law for ultimate decision by the court, depending upon the court’s determination of the meaning, scope and applicability of the statute.” (Emphasis supplied.)
As stated by the Court of Appeals, in Brown v. Kingsley Books (1 N Y 2d 177,181-182), the concept of obscenity is “ [i]mprecise * * * its ‘ vague subject matter ’ being largely 1 left to the gradual development of general notions about what is decent ’ (per L. Hand, J., United States v. Kennerley, 209 F. 119,121) ”. Thus, the problem involved in laying down a standard is to find 11 the present critical point in the compromise between candor and shame at which the community [has] arrived” (United States v. Kennerley, 209 F. 119, 121) and while it may be said, in obscenity cases, that the judgment of a jury is a valuable aid to the court in determining community standards, nevertheless, the court may not relinquish its responsibility in deciding the questions of law therein presented.
In People v. Richmond County News (9 N Y 2d 578, 580-581) Fuld, J., writing for the majority, stated: “ The courts below have characterized the magazine as 1 obscene ’, but whether that finding is justified requires us — despite contrary intimations in some of our decisions (see People v. Pesky, 254 N. Y. 373; People v. Muller, 96 N. Y. 408, 410) — to make an independent constitutional appraisal of the magazine. This court, as the State’s highest tribunal, no less than the United States Supreme Court, cannot escape its responsibility in this area ‘ by saying that the trier of the facts, be it a jury or a judge, has labeled the questioned matter as “ obscene,” for, if “ obscenity” is to be suppressed, the question whether a particular work is of that character involves not really an issue of fact but a question of constitutional judgment of the most sensitive and delicate kind.’ *335 (Roth v. United States, 354 U. S. 476, 497-498 [Harlan, J., concurring]; see, also, Feiner v. New York, 340 U. S. 315, 316; Watts v. Indiana, 338 U. S. 49, 51; Norris v. Alabama, 294 U. S. 587, 589-590; Lockhart and McClure, Censorship of Obscenity: The Developing Constitutional Standards, 45 Minn. L. Rev. 5, 114-20.) It involves not a simple question of fact, but a mixed question of fact and constitutional law, calling upon the court to make an appraisal of a publication and its contents against the requirements embodied in both State and Federal Constitutions (N. Y. Const., art. I, § 8; U. S. Const., 1st and 14th Arndts.). Consequently, if an appellate court were to rely upon and be bound by the opinion of the trier of the facts as to the obscenity of a publication it would be abdicating its role as an arbiter of constitutional issues.”
In United States v. Keller (259 F. 2d 54, 59) the defendant was convicted in the United States District Court for the Middle District of Pennsylvania for violations of section 1463 of title 18 of the United States Code, in that he deposited for mailing seven post cards “ upon which language of an indecent character was written ”. The Court of Appeals, in reversing the conviction, wrote: “In concluding that the defendant is not guilty of an offense under Section 1463 we have not lost sight of the fact that all the inferences that can be reasonably drawn from the evidence must be taken in favor of the United States. But the test of the sufficiency of the proof required to meet the test of the statute is for the court in the first instance. We point out also that the test of contemporary community standards is not met simply because a jury finds material submitted to it to be indecent or obscene. While the members of a jury live contemporaneously in a community and are a part of it, their judgment as to material being indecent or obscene is not equated as a matter of law to the contemporary community standard. The court must still determine whether the facts proved are sufficient under the statute. In our opinion the case should not have been sent to the jury. ’ ’
It is now well settled that “ obscenity is not within the area of constitutionally protected speech or press ” (Roth v. United States, 354 U. S. 476, 485, supra) since obscenity is “utterly without redeeming social importance ” (Roth v. United States, supra, p. 484) and that a State may enact constitutionally valid statutes to punish 1 ‘ those who publish, sell, or keep for sale publications ‘ incontestably found to be obscene ’ without offending against the guarantees of the First Amendment.” (People v. Richmond County News, supra, p. 581, citing Kingsley Books v. Brown, 354 U. S. 436, 440; Roth v. United States, 354 U. S. *336 476, 481; Alberts v. California, 354 U. S. 476.) But the right of the State to proscribe the sale and distribution of obscene material 1 ‘ does not mean that there can be no constitutional barrier to any form of practical exercise of that power ” (Smith v. California, 361 U. S. 147, 155) and “ [t]he danger of a violation of cherished First Amendment rights necessitates narrow construction; we may open ‘ the door barring federal and state intrusion into this area '* * * only the slightest crack necessary ’. (Roth v. United States, 354 U. S. 476, 488, supra.) ” (People v. Richmond County News, supra, p. 581.)
To review the history of the law of obscenity may be somewhat helpful. It is a relatively short history and appears to have had its origin in this country in the case of Commonwealth v. Holmes (17 Mass. 336) decided in 1821. During the 19th century the idea that obscene writing was a crime gained impetus; however, not without warnings against censorship emanating from such puritans as John Milton who, in his immortal ‘ ‘ Areopagitica ” stated: “ They are not skilful considerers of human things, who imagine to remove sin by removing the matter of sin * * * Though ye take from a covetous man all his treasure, he has yet one jewel left, ye can not bereave him of his covetousness. Banish all objects of lust, shut up all youth into the severest discipline that can be exercised in any hermitage, ye can not make them chaste, that came not thither so.”
In the case of Queen v. Hicklin (L. R. 3 Q. B. 360, 371) decided in 1868, Lord 'Chief Justice Cockburn laid down the following rule: “ I think the test of obscenity is this, whether the tendency of the matter charged as obscenity is to deprave and corrupt those whose minds are open to such immoral influences, and into whose hands a publication of this sort may fall.”
Although the “ Hicklin ” rule was adopted by some American courts and until recently provided the test in New York State (People v. Richmond County News, 9 N Y 2d 578, 584, supra; see, also, People v. Muller, 96 N. Y. 408, 411; People v. Doubleday & Co., 297 N. Y. 687, affd. 335 U. S. 848) it was not uniformly followed by all courts. In 1913, Judge Learned Hand-, writing for the court in United States v. Kennerley (209 F. 119,120-121, supra) questioned the validity of the “Hicklin” rule, saying: “ I hope it is not improper for me to say that the rule - as laid down, however consonant it may be with mid-Victorian morals, does not seem to me to answer to the understanding and morality of the present time, as conveyed by the words, ‘ obscene, lewd, or lascivious.’ I question whether in the end men will regard that as obscene which is honestly relevant to the adequate expression of innocent ideas, and whether they will not believe *337 that truth and beauty are too precious to society at large to be mutilated in the interests of those most likely to pervert them to base uses. Indeed, it seems hardly likely that we are even to-day so lukewarm in our interest in letters or serious discussion as to be content to reduce our treatment of sex to the standard of a child’s library in the supposed interest of a salacious few, or that shame will for long prevent us from adequate portrayal of some of the most serious and beautiful sides of human nature.”
The “ Hicklin ” rule was again justly criticized in the case of United States v. One Book Entitled “ Ulysses ” (72 F. 2d 705, 706-707, affg. 5 F. Supp. 182) where Judge Augustus Hand, writing for the Circuit Court of Appeals, pointed out that a book might be condemned on the basis of isolated passages in it rather than because of its “dominant effect”. He said: “ That numerous long passages in Ulysses contain matter that is obscene under any fair definition of the word cannot be gainsaid; yet they are relevant to the purpose of depicting the thoughts of the characters and are introduced to give meaning to the whole, rather than to promote lust or portray filth for its own sake. The net effect even of portions most open to attack, such as the closing monologue of the wife of Leopold Bloom, is pitiful and tragic, rather than lustful. The book depicts the souls of men and women that are by turns bewildered and keenly apprehensive, sordid and aspiring, ugly and beautiful, hateful and loving. In the end one feels, more than anything else, pity and sorrow for the confusion, misery, and degradation of humanity. * * * The book as a whole is not pornographic, and, while in not a few spots it is coarse, blasphemous, and obscene, it does not, in our opinion, tend to promote lust. The erotic passages are submerged in the book as a whole and have little resultant effect. ’ ’
The differences between the Federal circuits and among various State courts were finally resolved by a series of United States Supreme Court decisions beginning with Butler v. Michigan (352 U. S. 380, supra) wherein a Michigan statute had been construed to make it an offense to sell to the general public any book containing obscene language £ £ tending to the corruption of the morals of youth”. Mr. Justice Frankfurter, on behalf of a unanimous court, stated (pp. 382-384):
“It is clear on the record that appellant was convicted because Michigan, by § 343, made it an offense for him to make available for the general reading public (and he in fact sold to a police officer) a book that the trial judge found to have a potentially deleterious influence upon youth. The State insists that, by thus quarantining the general reading public against *338 books not too ragged for grown men and women in order to shield juvenile innocence, it is exercising its power to promote the general welfare. Surely, this is to burn the house to roast the pig. * * *
“ The incidence of this enactment is to reduce the adult population of Michigan to reading only what is fit for children. It thereby arbitrarily curtails one of those liberties of the individual, now enshrined in the Due Process Clause of the Fourteenth Amendment, that history has attested as the indispensable conditions for the maintenance and progress of a free society.”
In 1957, Roth v. United States (supra) and Alberts v. California (354 U. S. 476) were decided together by the United States Supreme Court. Here, the court repudiated both of the objectionable aspects of the “Hicklin” rule, namely: (1) that a book might be condemned on the basis of isolated passages rather than because of its “ dominant effect ” (United States v. One Book Entitled “ Ulysses ”, supra) and (2) that it “ reduce[d] our treatment of sex to the standard of a child’s library ”. (United States v. Kennerley, 209 F. 119, 121, supra.) Mr. Justice Brennan, in the Roth case (354 U. S. 476, 488-489) and summarizing the decisions that rejected the “Hicklin” rule, wrote: ‘ ‘ The early leading standard of obscenity allowed material to be judged merely by the effect of an isolated excerpt upon particularly susceptible persons. Regina v. Hicklin, [1868] L. R. 3 Q. B. 360. Some American courts adopted this standard but later decisions have rejected it and substituted this test: whether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest. The Hicklin test, judging obscenity by the effect of isolated passages upon the most susceptible persons, might well encompass material legitimately treating with sex, and so it must be rejected as unconstitutionally restrictive of the freedoms of speech and press.”
However, as pointed out by Judge Fuld in People v. Richmond County News (9 N Y 2d 578, 585-586, supra): “ [A]Ithough the Butler and Roth cases destroy the Hicklin rule, they do not lay down a test of obscenity binding on our interpretation of this State’s obscenity statute. # * * In the Roth case (354 U. S. 476, supra) the court did say that ‘ Obscene material is material which deals with sex in a manner appealing to prurient interest ’ (p. 487) and that the test was ‘ whether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest ’ (p. 489). These statements, however, can only indicate the broad boundaries of any permissible definition of obscenity *339 under the United States Constitution; they do not pretend to, and cannot, give specific content to the meaning of £ obscene ’ as it appears in our statute.”
The opinion of Judge Fuld continues: ‘ ‘ Mindful of the constitutional necessity to open the door barring state intrusion into this area ‘ only the slightest crack necessary ’ (Roth v. United States, 354 U. S. 476, 488, supra), and desirous of erecting a standard which embodies the most universal moral sensibilities and may be applied objectively, we are of the opinion that the prohibitions of section 1141 of the Penal Law should apply only to what may properly be termed ‘ hard-core pornography ’. The mere undemonstrated possibility of harm to the community from realistic accounts of normal sexuality is not of sufficient moment to warrant the exercise of the public force in their suppression. And this is true whether the narratives concerned may be said to have artistic or scientific justification or whether they lack anything of £ any possible value to society (Winters v. New York, 333 U. S. 507, 510, supra; see, also, Hannegan v. Esquire, Inc., 327 U. S. 146, 153, 158, supra.) ”
Chief Judge Desmond, in a concurring opinion (People v. Richmond County News, supra), wrote (pp. 588-589): ££ The intrinsic nature, tendency and bent of the work determines whether it is to be banned or its vendor punished. An eminent moral theologian explains, quite consistently with the controlling American decisions: £ For a book to be prohibited it is necessary that from its whole tenor the author’s intention is evident of teaching the reader about sins of impurity and arousing him to libidinousness ’ (Noldin, De Preceptis Dei et Ecclesiae, p. 658). St. John-Stevas, one of the soundest and sanest of today’s writers on the law of obscenity, says that:
‘ A pornographic book * * * is one deliberately designed to stimulate sex feelings and to act as an aphrodisiac ’ (Obscenity and the Law, p. 2; cf. Roth v. United States, 354 U. S. 476, 486, 487). * * * The inquiry for the court, therefore, is whether the publication is so entirely obscene as to amount to £ hard-core pornography ’ (not necessarily dealing with deviate sex relations since while there is a pornography of perversion,£ pornography ’ is not limited to the depiction of unnatural acts).” Referring to the publication there before the court, Judge Desmond continued (pp. 589-590):
££ This collection of sexy fiction and illustrations has little of literary merit or artistry and yet it is not in the First Amendment sense filthy or disgusting or deliberately corruptive or offensive to common decency under prevailing standards of taste. Virtuous adults will reject it (as all of us Judges would were we not *340 restrained by the Roth-Alberts legal test). Adolescents may be hurt by it. But our prepossessions are not the law and the reactions of children are not valid tests (Roth v. United States, 354 U. S. 476, 489, 490, supra).
“ Law in a pluralist society does not regulate literary standards or give expression to the loftiest virtues. Civil court decisions in such cases must be prudential, must be acts of practical judgment in the social order of our time and place. ‘ Human law cannot prohibit everything which the Natural law prohibits ’ (St. Thomas Aquinas, 700 years ago, in Summa Theologica, I-II, q. 96, art. 2, ad. 3) but must take full measure of human nature and current traditions. We follow the best ancient and modern legal thought and obey the spirit of our national charter when we interpret strictly — that is, liberally in favor of freedom — laws which restrict the right of free speech (Canon Law, canon 19; Matter of Excelsior Pictures Corp. v. Regents of Univ. of State of N. Y., 3 N Y 2d 237, 246, supra).”
It is well settled that the courts of our State have strictly limited the applicability of the statute to works of pornography and they have consistently refused to apply it to books of literary value. If the statute were to be construed in a narrower sense its effect would be to prohibit the portrayal in literature of a large and important area of life. The C'ourt of Appeals has consistently frowned upon such an interpretation (People v. Richmond County News, supra; People v. Wendling, 258 N. Y. 451; Halsey v. New York Soc. for Suppression of Vice, 234 N. Y. 1). The statute is aimed at pornography and a pornographic book must be taken to be one where all other incidents and qualities are mere accessories to the primary purpose of stimulating immoral thoughts. (People v. Viking Press, 147 Misc. 813, 814.) Therefore, if the judgments of the court below are to be upheld, this court must find that the dominant effect of the book, as a whole, and, indeed, its main purpose, is to stimulate sex feelings and to act as an aphrodisiac. This we are not prepared to do. To use the words of Judge Woolsey (United States v. One Book Entitled “ Ulysses ”, 5 F. Supp. 182, 185), while the book may be “ somewhat emetic, nowhere does it tend to be an aphrodisiac ”.
The Supreme Judicial Court of Massachusetts, in the case of Attorney General v. The Book named “ Tropic of Cancer ” (184 N. E. 2d 328 [Mass.], decided July 17,1962) has found that the book in question is not obscene. Cutter, Justice, writing for the majority said (pp. 333-335):
“ TYe think, in the light of the decisions reviewed above, that the First Amendment protects material which has value because *341 of ideas, news, or artistic, literary, or scientific attributes. If the appeal of material (taken as a whole), to adults is not predominantly prurient, adults cannot be denied the material. When the public risks of suppressing ideas are weighed against the risks of permitting their circulation, the guaranties of the First Amendment must be given controlling effect. The dangers of subjective judgments in the matter of censorship lead to a strong presupposition against suppression. We conclude, therefore, as in effect the New York court did in the Richmond County News case, that, with respect to material designed for general circulation, only predominantly ‘ hard core ’ pornography, without redeeming social significance, is obscene in the constitutional sense. * * * Whether Tropic is ‘ obscene ’ in the constitutional sense thus depends upon whether the appeal (if any) of Tropic (taken as a whole) to the normal adult is predominantly prurient. It is not relevant that we think that the book at many places is repulsive, vulgar, and grossly offensive in the use of four letter words, and in the detailed and coarse statement of sexual episodes. That a serious work uses four letter words and has a grossly offensive tone does not mean that the work is not entitled to constitutional protection. Much in modern art, literature, and music is likely to seem ugly and thoroughly objectionable to those who have different standards of taste. It is not the function of judges to serve as arbiters of taste or to say that an author must regard vulgarity as unnecessary to his protrayal [sic] of particular scenes or characters or to establish particular ideas. Within broad limits each writer, attempting to be a literary artist,-is entitled to determine such matters for himself, even if the result is as dull, dreary, and offensive as the writer of this opinion finds almost all of Tropic.
“ Competent critics assert, and we conclude, that Tropic has serious purpose, even if many will find that purpose obscure. There can be no doubt that a significant segment of the literary wbrld has long regarded the book as of literary importance. A majority of the court are of opinion that the predominant effect and purpose of the book as a whole is not prurient. If under the Roth case it be a relevant consideration, a majority of the court are of opinion that Tropic is more likely to discourage than ‘ to excite lustful thoughts.’ We think that the book must be accepted as a conscious effort to create a work of literary art and as having significance, which -prevents treating it as hard core pornography. * * *
“We hold that Tropic is not ‘ obscene ’ in the constitutional sense. It cannot constitutionally be held to be obscene under G. L. c. 272, §§ 280, 28E, and 28F. We rest our decision squarely *342 on the First Amendment, so that, if review of our decision is sought, there may be no doubt that this case has been decided solely upon the Federal issue.”
In “ Tropic of Cancer ” the author endeavors to portray a period of his life spent in the back streets of the Montparnasse section of Paris. Frequently and throughout the book he describes with unbridled candor his sexual experiences as well as those of his colleagues. ‘ ‘ However, sex and obscenity are not synonymous * * * Sex, a great and mysterious motive force in human life, has indisputably been a subject of absorbing interest to mankind through the ages; it is one of the vital problems of human interest and public concern.” (Roth v. United States, 354 U. S. 476, 487, supra.) To be certain, the language employed in the book is undoubtedly salty, vulgar, and indecent and not of the kind reserved for the drawing room. However, we are not here concerned with the propriety of the language employed as measured in terms of proper social discourse. We are considering a book to be read in the privacy of one’s home or study. Nor can we hold it to be obscene merely because it may offend the standards of common decency prescribed by certain persons for themselves, or because it may fall into the hands of young and immature people. The book as a whole is very clearly not a work of pornography within the standards established by our courts so as to bring it within the proscribed area of the statute. It is not necessary for the court to decide whether it is an important work of literature.
One additional item requires brief comment. While the question of scienter was submitted to the jury under proper instructions, their finding of knowledge upon the part of the defendants, inherent in their verdict, was contrary to the weight of the evidence.
The judgments of conviction appealed from are reversed on the law and on the facts, the information is dismissed, and the fines imposed upon the defendants are remitted.